AO 93 Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
for the
District of Arizona

| | |
|---|---|
| In the Matter of the Search of | Case No.   22-4259mb |
| Information associated with the cellular telephone assigned call numbers (928) 675-7261 and (928) 326-5063 that are stored at premises controlled by Cellular One. | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of Arizona:

**As further described in Attachment A.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

**As set forth in Attachment B.**

**YOU ARE COMMANDED** to execute this warrant on or before _____August 5, 2022_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☒ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to any United States Magistrate Judge on duty in the District of Arizona.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for_____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____.

Date: _____

Camille D. Bibles
Digitally signed by Camille D. Bibles
Date: 2022.07.22 08:43:22 -07'00'

_____
*Judge's signature*

City and state: Flagstaff, Arizona

Honorable Camille D. Bibles, U.S. Magistrate Judge
*Printed name and title*

AO 93 (Rev. 01/09) Search and Seizure Warrant (Page 2)

## RETURN

| Case No.: 22-4259mb | Date and Time Warrant Executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory Made in the Presence of:

Inventory of the property taken and name of any person(s) seized:

## CERTIFICATION

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to records and information associated with the cellular telephones (928) 675-7261 ("Target Telephone 1") and (928) 326-5063 ("Target Telephone 2"), which are stored at premises controlled by Cellular One, a wireless telephone service provider headquartered at 1500 S. White Mountain Rd #103, Showlow, AZ 85901.

**ATTACHMENT B**

**Particular Things to be Seized**

I.     **Information to be Disclosed by the Service Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Accounts listed in Attachment A for the time period April 1 to April 30, 2022:

    a.  The following information about the customers or subscribers of the Account:

        i.   Names (including subscriber names, user names, and screen names);

        ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.   Length of service (including start date) and types of service utilized;

        vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

        viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records.

    b.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

        i.   the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

        ii.  information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §§ 1153 and 113(a)(3), Assault with a Dangerous Weapons; 18 U.S.C. §§ 1153 and 113(a)(6), Assault Resulting in Serious Bodily Injury; and 18 U.S.C. § 924(c)(1)(A)(iii), Use of a Firearm During and in Relation to a Crime of Violence, involving REGINALD TACHINE, JR., o or about April 19, 2022, to include the period April 1 to April 30, 2022.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Cellular One, and my title is _____ _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Cellular One. The attached records consist of _____ [*generally describe records in terms of pages/CDs/megabytes*]. I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Cellular One, and they were made by Cellular One as a regular practice; and

b.      such records were generated by an electronic process or system used by Cellular One that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Cellular One in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Cellular One, and, at all times pertinent to the records certified here, the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                               Signature

AO 106 Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

| | |
|---|---|
| In the Matter of the Search of | Case No.  22-4259mb |
| Information associated with the cellular telephone assigned call numbers (928) 675-7261 and (928) 326-5063 that are stored at premises controlled by Cellular One. | |

## APPLICATION FOR A SEARCH WARRANT

I, Timothy Chan, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**As further described in Attachment A**

**This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A).**

located in the District of Arizona, there is now concealed:

**As set forth in Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 18 U.S.C. § 113(a)(3) | Assault with a Dangerous Weapon |
| 18 U.S.C. § 113(a)(6) | Assault Resulting in Serious Bodily Injury |
| 18 U.S.C. § 924(c)(1)(A)(iii) | Discharge of a Firearm During and in Relation to a Crime of Violence |

The application is based on the facts contained in the attached Affidavit of Special Agent Timothy Chan.

- ☒ Continued on the attached sheet.
- ☐ Delayed notice of __ days is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Dimitra Sampson  DIMITRA SAMPSON  Digitally signed by DIMITRA SAMPSON Date: 2022.07.21 14:28:01-07'00'

_____
*Applicant's Signature*

Timothy Chan, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

Camille D. Bibles  Digitally signed by Camille D. Bibles Date: 2022.07.22 08:43:49 -07'00'

_____
*Judge's signature*

City and state: Flagstaff, Arizona

Honorable Camille D. Bibles, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to records and information associated with the cellular telephones (928) 675-7261 ("Target Telephone 1") and (928) 326-5063 ("Target Telephone 2"), which are stored at premises controlled by Cellular One, a wireless telephone service provider headquartered at 1500 S. White Mountain Rd #103, Showlow, AZ 85901.

1

## ATTACHMENT B

### Particular Things to be Seized

I.     **Information to be Disclosed by the Service Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Accounts listed in Attachment A for the time period April 1 to April 30, 2022:

  a.  The following information about the customers or subscribers of the Account:

     i.  Names (including subscriber names, user names, and screen names);

     ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

     iii.  Local and long distance telephone connection records;

     iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

     v.  Length of service (including start date) and types of service utilized;

     vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

     vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

     viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records.

    b.   All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

        i.   the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

       ii.   information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §§ 1153 and 113(a)(3), Assault with a Dangerous Weapons; 18 U.S.C. §§ 1153 and 113(a)(6), Assault Resulting in Serious Bodily Injury; and 18 U.S.C. § 924(c)(1)(A)(iii), Use of a Firearm During and in Relation to a Crime of Violence, involving REGINALD TACHINE, JR., o or about April 19, 2022, to include the period April 1 to April 30, 2022.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

3

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Timothy Chan, being duly sworn, state the following:

**INTRODUCTION AND AGENT BACKGROUND**

1.       I make this Affidavit in support of an application for a search warrant for information associated with cellular telephones assigned call numbers (928) 675-7261 ("Target Telephone 1") and (928) 326-5063 ("Target Telephone 2"), which are stored at premises controlled by Cellular One, a wireless telephone service provider headquartered at 1500 S. White Mountain Rd #103, Showlow, AZ 85901.   The facts of the case and probable cause for the search are described below.   The information to be searched is described in the following paragraphs and in Attachment A.   This Affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require the Service Provider to disclose to the government copies of the information further described in Section I of Attachment B.   Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2.       I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been since 2019.   I am currently assigned to the Gallup, New Mexico, Resident Agency of the Phoenix, Arizona, FBI Field Division.   I have received training at the Federal Bureau of Investigation Training Academy in Quantico, Virginia as well as training in the investigation of assault, murder, and other violent crimes.

3.   ,    In the course of my official duties, I am charged with the investigation of crimes occurring on (among other places) the Navajo Nation Indian Reservation within the Federal District of Arizona.   I am an investigative law enforcement officer of the United States, and I am empowered by law to conduct investigations and to make arrests for offenses enumerated in Title

1

18 of the United States Code.

4.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement agents and witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested search warrant and does not set forth all of my knowledge about this matter.

5.    REGINALD TACHINE, JR. ("Tachine"), an Indian, was charged by Complaint on April 28, 2022, with the following crimes: Count 1, Assault with a Dangerous Weapon, in violation of 18 U.S.C. §§ 1153 and 113(a)(3); Count 2, Assault Resulting in Serious Bodily Injury, in violation of 18 U.S.C. §§ 1153 and 113(a)(6); and Count 3, Discharge of a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).   The events described in this document occurred within the confines of the Navajo Nation Indian Reservation, Indian Country, in the District of Arizona, on or about April 19, 2022 (unless otherwise described in this affidavit).   In addition to the probable cause previously found to establish these criminal violations, there is also probable cause to search the information described in Attachment A for evidence, such as location data, as further described in Attachment B.

## PROBABLE CAUSE

6.    On April 19, 2022, I was in contact with Navajo Department of Criminal Investigations ("NDCI") Criminal Investigator ("CI") Cornelia Perry.

7.    CI Perry advised that she was in receipt of information regarding a possible assault occurring near Pinon, Arizona, which was within the exterior boundaries of the Navajo Nation Indian Reservation.   The assault was said to have occurred on April 19, 2022.

8.    It was learned from CI Perry that the victim, Y.B., was traveling in her vehicle with T.T. and L.T.   A pickup truck pulled out behind Y.B. and Y.B. pulled over.   Someone got out of

2

the pickup truck and started shooting a weapon in the direction of Y.B.'s vehicle.

9.    Y.B. and those in her vehicle were able to drive away, but Y.B. had been struck by a projectile.    Y.B. was later transported to the hospital in Chinle, Arizona and subsequently flown from Chinle to the Flagstaff Medical Center in Flagstaff, Arizona, where among other things, Y.B. underwent surgery to remove any projectiles lodged in her body.

### Interview of Y.B.

10.    On April 21, 2022, Y.B. was interviewed by FBI Special Agents Dustin Drace and Brendan Morley while admitted as a patient at the Flagstaff Medical Center.    Y.B. was unable to drink during the interview because it made it hard for her to breathe.    Y.B. provided the following information:

11.    On the morning of the shooting, T.T. got his vehicle stuck on the side of the highway near Low Mountain, Arizona.    T.T. contacted Y.B. and L.T. to come help him.    Y.B. and L.T. got a ride to where T.T. was.

12.    Y.B., L.T., and T.T. used a shovel and a car jack to get the vehicle unstuck.    T.T. just got the vehicle and wanted Y.B. to drive.    They started to drive back to L.T.'s residence. Y.B. was driving the car with T.T. in the front seat and L.T. in the back seat.

13.    Approximately twenty minutes later, a pickup truck pulled out behind Y.B.    She recognized the vehicle – a white, 4-door Dodge Ram – to be that of her cousin-brother Tachine[1], whom she also knew by the nickname "Zoo."    She knew it was Tachine's truck because she recognized it from having only one headlight.    Tachine drove up behind Y.B., so she stopped.

---

[1]   In the original FBI recorded interview on April 21, 2022, Y.B. advised that her cousin-brother was Reginald Tsosie. In a telephonic, unrecorded interview on April 27, 2022, Y.B. advised that her cousin-brother was Reginald Tachine and that she misspoke in the first interview. SA Drace attempted to locate information pertaining to an individual by the name of Reginald Tsosie in FBI databases and through the NDCI, but no information for a Reginald Tsosie was located.

14.     There wasn't a reason for Tachine to drive up behind Y.B.   She believes it was just because she was driving in the area.

15.     Y.B. pulled over to the side of the road and stopped.   She was going to get out of the vehicle to ask Tachine what he was doing driving around at 2:00 AM, but her door got stuck. Y.B. observed Tachine exiting his truck in her rearview mirror.   She did not observe Tachine with a gun and did not recall what clothes he was wearing.   She may have seen two other people with Tachine.   Tachine was usually with J.LNU and M.B.

16.     Y.B. and Tachine got along, which is why she wanted to get out of the vehicle to talk to him.   She did not know if Tachine and T.T. had problems with each other.

17.     T.T. got out of the vehicle.   Y.B. heard T.T. and Tachine saying something to each other, but she couldn't hear what was being said.   T.T. was out of the vehicle for approximately two or three minutes.   A scuffle behind the vehicle Y.B. was driving ensued.   Y.B. wasn't sure who punched who, but either Tachine or T.T. ended up on the ground.   T.T. ran back to the car and told Y.B. to "go."

18.     Y.B. couldn't go because she turned off the vehicle when she went to get out.   Y.B. started the vehicle, then felt herself get hit by a bullet.   Y.B. heard another four shots total: one missed, one hit the windshield, and two hit her.

19.     Y.B. said she got shot.   T.T. was able to push the gas for her and they drove away. T.T. was able to help Y.B. slide to the passenger side of the vehicle and get into the driver's seat. Tachine also drove away.

20.     They started to drive to the hospital.   They saw a police vehicle and followed it until they were able to meet an ambulance.

21.     Y.B. believes Tachine shot her because they were driving around in the area around

4

M.W.'s residence down to the "tunnels" west of there.   Tachine did not like people driving near there.   He was always in his pickup trying to stop people.

22.     Y.B. does not think Tachine knew she was in the vehicle and did not think Tachine should be punished for what he did because he did not know he was shooting at her.   Y.B. said no one in the vehicle she was driving had any weapons.

<u>Interview of T.T.</u>

23.     On April 19, 2022, I interviewed T.T. with CI Perry at two locations.   The first location was the eventual location of the vehicle in which Y.B. was shot.   The second location was in front of T.T.'s home.   T.T. provided the following information:

24.     Y.B., T.T., and L.T. were driving around prior to the shooting.   A truck pulled up from behind when Y.B. recognized the vehicle and put the car in park.   The individuals in the vehicle behind started firing shots at them.   Y.B. collapsed on the floor and T.T. put the vehicle in drive to take off to the nearest residence.

25.     T.T. noticed the driver was tall and T.T. had heard about him, further stating the driver goes by "Zoo."   The same evening of the shooting, T.T. found out that Zoo's real name was Reginald Tachine.

26.     When Y.B. pulled the car over, T.T. got out of the car and saw a silhouette of a person carrying a gun on one side and a shotgun on another side.   There were three individuals that got out of the car.   T.T. didn't really know Tachine, other than that he was Y.B.'s cousin and he went by "Zoo."   T.T. stated he saw the person with the gun and recognized his face.   When the car got put in park T.T. said, "Oh it's your cousin that's driving."

<u>Interview of W.S.</u>

27.     On April 25, 2022, I interviewed W.S. with Special Agent Brendan Morley while

5

at the scene of a separate crime being investigated by the Phoenix FBI Gallup Resident Agency (as will be discussed more fully below).   W.S. provided the following information:

28.     "Zoo" stopped by his residence and stated he messed up and killed somebody in Whippoorwill.  Zoo shot up a car because someone hit him with a bat, so Zoo ran back to his truck, got his "AR" and unloaded on the car, possibly shooting a girl in the head.   The girl driving the car was nicknamed "Soda," later identified as Y.B.   Zoo's real name was identified as "Reginald."

<u>Evidence Recovery</u>

29.     On April 19, 2022, I traveled to the scene of the shooting with CI Cornelia Perry. An open field search of the scene uncovered eight (8) rifle shell casings.   Upon further examination, the shell casings were .223 caliber rifle rounds, consistent with the type of caliber fired by an "AR" style weapon.   On April 21, 2022, Flagstaff Medical Center provided the FBI a bullet fragment that was recovered from the body of Y.B. during surgery.

<u>Medical Results</u>

30.     On April 27, 2022, Y.B. was still an admitted patient at the Flagstaff Medical Center.  After a discussion with the charge nurse, reading from medical documentation detailing the extent of Y.B.'s injuries, including documentation by the attending physician, the following information was learned:

31.     Y.B. suffered two gunshot wounds to her back.   The gunshot wounds resulted in excessive bleeding and required surgical removal of internal bodily organs.   Among others, the following items were noted following surgery:

     a.  Y.B.'s spleen was removed due to damage from the gunshot wounds;

     b.  A portion of Y.B.'s colon was removed due to a laceration caused by

penetration of the bullet;

c. Y.B.'s diaphragm was repaired due to bullet fragments damaging parts of the diaphragm;

d. Y.B.'s left lung was bruised resulting in blood filling the lung and a chest tube being placed in Y.B. to aid in breathing; and

e. Y.B.'s 7th and 10th ribs were fractured.

### Arrest of Tachine

32.     On April 28th, 2022, a Federal Arrest Warrant was issued for Tachine. Numerous unsuccessful attempts were made to locate and arrest Tachine. A joint operation to apprehend Tachine occurred on May 11, 2022, with Navajo Nation Police Department ("NNPD"), Navajo County Sheriffs ("NCS"), and the FBI. An additional FBI operation for execution of a search warrant for the apprehension of Tachine occurred on June 1, 2022, where the FBI deployed numerous law enforcement techniques that resulted in zero yield. The same day, FBI and NCS conducted a simultaneous operation in the Pinon, Arizona community to gather information on the whereabouts of Tachine. NNPD eventually located and arrested Tachine on the evening of July 10, 2022. A community member provided a tip that Tachine was staying in a particular car and in a particular location. According to NNPD, two patrol officers responded to the location of the car where TACHINE was said to be staying. In the attempt to apprehend Tachine, the patrol officers got into an altercation with him resulting in Tachine resisting arrest and acquiring wounds that required hospital attention. Pursuant to an arrest warrant issued in the District of Arizona, FBI Special Agents took custody of Tachine on the morning of July 11, 2022, in Chinle, Arizona, at which time he was transferred to Coconino County for holding prior to his Federal Initial Appearance.

<u>Custodial Interview of Tachine</u>

33.     On July 11, 2022, Tachine agreed to speak with FBI Special Agent Dustin Drace. After being mirandized and provided a copy of his rights via a standard FBI FD-395 form, Tachine signed the form and agreed to speak without a lawyer present.

34.     According to Tachine, the night that Y.B. was shot, April 19, 2022, there were only two people in the vehicle he was in: himself and his cousin Troy Tachine ("Troy")[2].   Tachine stated that he got into a fight with T.T. (the T.T. listed above as having been in the vehicle Y.B. was driving) and T.T. punched Tachine.   Tachine claimed that Troy fired off three (3) rounds in the direction of the car in which Y.B. and L.T. were sitting, in order to end the altercation. Tachine said he did not fire any shots.

<u>Troy Tachine Investigation</u>

35.     On April 25, 2022, the body of a person believed to be Troy Tachine was located with a gunshot wound to the head.   The body was located with the help of W.S., who guided law enforcement to the scene.   It was during that investigation that W.S. provided law enforcement the information about Tachine stating he messed up and possibly shot a girl in the head with an AR in the Whipporwill area.

<u>Interview of S.T.</u>

36.     After the arrest of Tachine, FBI Agents spoke with a close relative of Troy's, S.T. When asked about the relationship Troy and Tachine had, S.T. stated Troy wasn't sure why he re-connected with Tachine.   S.T. stated Troy and Tachine did not get along and provided an example when Troy returned home beaten up.   According to S.T., Troy stated that Tachine and his friends

---

[2]   Troy Tachine is a now deceased individual and not the T.T. who was in the vehicle with Y.B. and interviewed by the FBI, as set forth above.

8

took Troy out to the middle of nowhere, jumped him (meaning physically beat Troy up), and left him there.   S.T. stated they believe that Troy was killed by Tachine.   S.T. provided the following three (3) telephone numbers for Troy.   S.T. stated that the T-Mobile telephone was Troy's lifeline, and he didn't go anywhere without it.   The telephone numbers are as follows:

      a.   623-272-6778 (T-Mobile)

      b.   928-675-7261 (Cellular One)

      c.   928-326-5063 (Cellular One)

37.   On July 18, 2022, S.T. called FBI Gallup and voluntarily provided additional information.   Regarding the day of the shooting, according to S.T., her father told her that Tachine came by his house on April 19, 2022, at an unspecified time, to pick up N.K.   According to S.T.'s father, Tachine arrived at his place of residence with Troy in the car to pick up N.K., totaling three (3) individuals in the vehicle at that point.

38.   Based on the foregoing, there is probable cause to believe that if Troy used his phone as "a lifeline" as stated by S.T., there is relevant evidence contained in Troy's cell phone records, to include information regarding with whom Troy was communicating up to, during, and following the shooting, and the location of his cellular phone during that time.   For instance, if Troy was in fact in a vehicle with Tachine during the timeframe Y.B. was shot, they most likely would not be communicating with one another via cell phone during that time frame.   Information disclosed by the providers such as call records and cell-site location information will help establish the whereabouts of Troy during the assault of Y.B. during this relevant time frame and may provide other useful information about who may have been involved.

39.   Based on my training and experience I have learned that the Service Provider is a company that provides cellular telephone access to the general public.   I also know that providers

9

of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

40.    Based on my training and experience, I know that the Service Provider can collect cell-site data about the Target Telephones.   I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

41.    Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent

10

or received by a particular phone and other transactional records, in their normal course of business.   In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Telephone's user or users and may assist in the identification of co-conspirators and/or victims.

42.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure.

43.     This affidavit was sworn telephonically before a United States Magistrate Judge legally authorized to administer an oath for this purpose.

**Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.**

_____                    7/21/22
Timothy Chan                                 _____
Special Agent, FBI                           Date


 x  SWORN BY TELEPHONE


SWORN AND SUBSCRIBED to before me this _____day of July, 2022.

Camille D. Bibles   Digitally signed by Camille D.
                    Bibles
                    Date: 2022.07.22 08:44:29 -07'00'
_____                    _____
Honorable Camille D. Bibles                  Date
United States Magistrate Judge

11